UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


MCC MANAGEMENT OF NAPLES, INC.; BGC
II MANAGEMENT OF NAPLES, INC.; MILES
C. COLLIER; BARRON G. COLLIER, II,

                    Plaintiffs,

vs.                                    Case No.  2:07-cv-387-FtM-29SPC

ARNOLD  &  PORTER,  LLP;  KENT  A.
YALOWITZ; THOMAS R. DWYER; MELVIN C.
GARBOW,

                    Defendants.
_____

MCC MANAGEMENT OF NAPLES, INC., BGC
II MANAGEMENT OF NAPLES, INC., MILES
C. COLLIER, BARRON G. COLLIER, II,

                    Plaintiffs,
                                       Case No.  2:07-cv-420-FtM-29DNF

ARNOLD & PORTER, LLP,

                    Defendant.
_____


**OPINION AND ORDER**

     This matter comes before the Court on Defendants' Motion to
Strike Privileged and Confidential Material (Doc. #66).[1]  This
motion seeks to strike approximately 169 paragraphs from the Second
Amended Complaint (Doc. #40) on the basis that information set
forth  in  those  paragraphs  was  derived  from  privileged  and
confidential communications between defendant Arnold & Porter LLP

_____
     [1]Unless otherwise stated, the docket numbers refer to Case No.
2-07-cv-387.

and its client, Local Financial Corporation (LFC) and its subsidiaries, predecessors and successors (collectively, "Local") (see Doc. #66, pp. 2-3).[2] Defendants assert that plaintiffs and their counsel induced a former executive of LFC, Kristy Diane Carver (Carver), to disclose this privileged and confidential information, in violation of Carver's fiduciary and professional duties and in violation of counsel's ethical obligations, and that plaintiffs' counsel used the information to draft the Second Amended Complaint. (See id. at p. 2.) Plaintiffs filed a Response (Doc. #81) in opposition to the motion.

In a prior Opinion and Order (Doc. #190), the undersigned vacated an Order (Doc. #92) in which the magistrate judge denied the Motion to Strike. The Court in part found that, even assuming the allegations in the Motion to Strike were correct and the attorney-client privilege belonging to Local was violated, defendants lacked standing to assert that privilege or to seek a remedy for its breach in this litigation (see Doc. #190, p. 6). The Court further found, however, that a federal court has the inherent authority to impose sanctions on parties and lawyers if there is a showing of bad faith, Gwynn v. Walker (In re Walker), 532 F.3d 1304, 1309 (11th Cir. 2008); Amlong & Amlong, P.A. v.

_____

[2]In their Closing Memorandum, defendants expand the requested relief to include suppression of information obtained from Kristy Carver, dismissal of the Second Amended Complaint with prejudice, imposition of attorneys' fees and costs, and disqualification of all current counsel for plaintiffs (see Defs.' Closing Mem., p. 27).

<u>Denny's, Inc.</u>, 500 F.3d 1230, 1239 (11th Cir. 2006), and has the inherent power to "manage the conduct of litigation before it." <u>Reese v. Herbert</u>, 527 F.3d 1253, 1263 (11th Cir. 2008). (<u>See</u> Doc. #190, pp. 6-7.) The Court agreed that inducing a violation of the attorney-client privilege under the circumstances alleged in this case, if true, may indeed warrant the exercise of the Court's inherent power to remedy misconduct (<u>see</u> <u>id.</u> at p. 7). The Court was satisfied that defendants had proffered sufficient grounds and facts to justify an evidentiary hearing concerning whether plaintiffs' counsel engaged in misconduct regarding Carver during the course of this litigation (<u>see</u> <u>id.</u>). The Court scheduled an evidentiary hearing to determine the facts prior to determining what, if any, misconduct occurred and what, if any, remedy is appropriate (<u>see</u> <u>id.</u> at p. 8).

The Court conducted the evidentiary hearing on December 12 and 23, 2008, and January 28, 2009. The Court heard live testimony from three of plaintiffs' attorneys: Carl Joseph Coleman, Terry A. Moore, and David Potter; plaintiffs' representative Joseph Perkovich; and two of the defendants: Thomas R. Dwyer and Dent A. Yalowitz. The Court also heard testimony by video deposition from Kristy Diane Carver, Abigail C. Watts-FitzGerald, Bruce Stephen Sherman, Edward A. Townsend, and Lisa Kelley Gallagher.

Each side has also submitted under seal an expert report by well-credentialed attorneys opining on the matters before the Court. Perhaps not surprisingly, the experts disagree with each

other and support the positions of their respective clients. The parties have each filed closing argument memoranda under seal. Both sides were also permitted to supplement the record of the evidentiary hearing.

Defendants assert that plaintiffs and their counsel induced Carver to disclose privileged and confidential information; that Carver in fact disclosed privileged and confidential communications to plaintiffs and their counsel, in violation of her fiduciary and professional duties; that the conduct of plaintiffs' attorneys violated rules of professional conduct; that plaintiffs' counsel used the privileged and confidential information to draft the Second Amended Complaint; and that such conduct cannot be tolerated. Plaintiffs respond that their attorneys complied with all legal and ethical requirements when making contact with Carver. Further, plaintiffs assert that the information received from Carver was neither privileged nor confidential as to them, and alternatively, that any purported privilege or confidentiality had been waived by Local in multiple ways.

**I.**

The legal issues are premised on a lengthy and sometimes contentious relationship between Local and the Colliers. To place the parties' arguments in context, some rather detailed factual background is necessary. The Court makes the following findings of fact solely for the purpose of this motion.

**A.  The Parties and Relevant Third Parties:**

Plaintiff MCC Management of Naples, Inc. ("MCC Management") is a Florida corporation which is the assignee of certain rights and obligations of plaintiff Miles C. Collier relating to the matters relevant to the Second Amended Complaint.  Plaintiff BGC II Management of Naples, Inc. ("BGC II Management") is a Florida corporation which is the assignee of certain rights and obligations of plaintiff Barron G. Collier II relating to the matters relevant to the Second Amended Complaint.  Miles C. Collier, Barron G. Collier II and various in-house representatives are collectively referred to as the "Colliers"; plaintiffs are collectively referred to as the "Collier Parties" or plaintiffs.

Defendant Arnold & Porter, LLP ("Arnold & Porter") is a limited liability partnership providing professional legal services.  At all relevant times, defendants Kent A. Yalowitz (Yalowitz), Thomas R. Dwyer (Dwyer) and Melvin C. Garbow (Garbow) were attorneys employed by Arnold & Porter.

The identity of the financial institution that was a client of Arnold & Porter has changed over the relevant time period.  Unless otherwise specified, the financial institution will be generically referred to as "Local."

**B.  The Savings and Loan Crisis of the 1980s:**

In the late 1980s, the Federal Savings and Loan Insurance Corporation (FSLIC) made efforts to sell failing savings and loan

institutions ("thrift institutions") in exchange for, *inter alia,* certain reimbursement and tax benefits.  Under the provisions of the Internal Revenue Code at the time, FSLIC's reimbursement of covered asset losses was not included in the gross income of the acquiring institution.  Additionally, the Internal Revenue Code allowed the acquiring institution to take a tax deduction for covered asset losses even though FSLIC reimbursed those losses with tax-free assistance.  These tax benefits were intended to encourage investors to buy failing thrift institutions, typically accomplished through an Assistance Agreement.

## C.  Local Acquires a Thrift Institution:

In 1988, Edward A. Townsend (Townsend) joined Local as its President, Chairman and Chief Executive Officer (CEO).  In due course, Townsend was authorized by Local's Board of Directors to submit a proposal to acquire a failing thrift institution.  On December 29, 1988, Local and the FSLIC executed an Assistance Agreement (Defs.' Exh. BBB) wherein Local agreed to acquire Community Federal Savings & Loan Association, a renamed entity composed of two failing thrift institutions.  The Assistance Agreement provided for a sharing between Local and the FSLIC of the covered asset loss tax deductions and other tax benefits, and required Local to make sharing payments to FSLIC thirty days after Local filed its annual tax returns.[3]

---

[3]In 1989, Congress adopted the Financial Institutions Reform,
(continued...)

**D. Local Is Purchased by the Colliers:**

In the Spring of 1989, the Colliers purchased all of the outstanding shares of stock in Local. Afterwards, Bruce Sherman (Sherman) became a Director and Officer and was charged, among other things, with recruiting management to run Local. In August-September, 1992, Townsend left Local at the request of the new Board because of management differences.

**E. The Guarini Legislation:**

On August 10, 1993, the Omnibus Budget Reconciliation Act of 1993 (the "Guarini legislation" or OBRA) was signed into law. Pub. L. No. 103-66, 107 Stat. 312, 485 (1993). The Guarini legislation eliminated the favorable covered asset loss deduction that had been available to Local in connection with the acquired thrift institution. Sherman, acting on behalf of the Colliers, directed Local's officers to take whatever action was necessary to manage the Guarini legislation process to the most successful possible conclusion. Sherman's designees began by engaging the law firm of Arnold & Porter.

---

[3](...continued)
Recovery, and Enforcement Act, 12 U.S.C. § 1811, et seq. (FIRREA). Among other things, FIRREA abolished the FSLIC and shifted its deposit insurance functions to the Federal Deposit Insurance Corporation (FDIC). The FDIC assumed all of FSLIC's rights, privileges, duties and obligations under the Assistance Agreement. Therefore, the Court will refer to the FDIC instead of the FSLIC from this point forward.

**F.  Local's Retention of Arnold & Porter:**

On December 10, 1993, Local signed a retainer agreement with the law firm of Arnold & Porter for legal services in connection with the preparation of a memorandum regarding certain options available to entities adversely affected by the Guarini legislation's enactment.  (See Defs.' Exh. CCC.)  Arnold & Porter had other similarly-situated clients, and the costs of this legal service were being shared among the clients.  Three clients ultimately sued the United States, as discussed below.

On March 14, 1994, beginning with the first payment due after the Guarini legislation, Local stopped making tax sharing payments to the FDIC, asserting that it was entitled to do so under Section 9(f) of the Assistance Agreement.  Local began to escrow funds, however, to cover the principal amounts of the tax sharing payments that it may eventually owe the FDIC under the Assistance Agreement.  Local also created a deferred tax asset on its books, based on its position when the principal amounts were paid to the FDIC, they would be deductible for tax purposes.  These actions were not taken based upon advice from Arnold & Porter, which had no role in the decision.

**G.  FDIC Lawsuit:**

On September 17, 1996, Local, through its retained counsel Arnold & Porter, filed suit in the United States Court of Federal Claims asserting, *inter alia*, that the Guarini legislation

constituted a breach of the Assistance Agreement (the "FDIC Claim"). In January 1997, the United States filed a counterclaim seeking recovery of the tax sharing payments, plus interest, due under the Assistance Agreement that had been withheld by Local (the "FDIC Counterclaim") (collectively, the "FDIC Case").

Kristy Carver, Local's director of corporate tax, was Local's primary contact with Arnold & Porter concerning the FDIC Case. Carver, an Oklahoma licensed Certified Public Accountant, eventually became Local's Vice President and then Senior Vice President, but her relevant job functions remained essentially the same. Carver was the Local official who knew the most about the FDIC Case and had the most hands-on involvement with it and Arnold & Porter.

In early 1997, attorney Tom Dwyer of Arnold & Porter informed Carver that none of his other clients had deducted any principal payments to the FDIC and that none had created a deferred tax asset. Dwyer stated that he was very surprised that Local would have booked such an asset. By 1997, Local's principal accrual had reached approximately $12 million and the deferred tax asset had reached approximately $3 million. In a Memorandum dated June 10, 1997, Carver advised Bruce Sherman that Arnold & Porter, the Arthur Anderson accounting firm, and she had determined that the principal payments would not be deductible when made to the FDIC and thus there was no deferred tax asset. Carver reported that Arthur Anderson advised that the entire $3 million deferred tax asset must

be written off before June 30, 1997.  In a July 21, 1997 Memorandum to Sherman and others, Carver provided a more detailed analysis as to why any principal payments made to the FDIC in satisfaction of the Assistance Agreement would not be deductible for federal income tax purposes and why the deferred tax asset relating to this liability was worthless and must be written off as of June 30, 1997 (the end of Local's fiscal year).  A substantial portion of the amounts were written off.

During the Colliers' ownership of Local, no law firm other than Arnold & Porter provided Local with legal services in the FDIC dispute.  While the scope of work performed changed dramatically from that set forth in the initial December 10, 1993 written retainer agreement, no amended or new retainer agreement was entered between Local and Arnold & Porter.

## H.  Local Sold by the Colliers Pursuant to Redemption Agreement:

Although Edward Townsend was no longer employed at Local, he continued to follow its status.  By 1995-96, Townsend had observed what he believed to be a deterioration in the numbers at Local and felt there might be an opportunity to purchase Local, an institution he knew well.  In early 1997, Townsend put together a group of private investors to purchase Local (the "Townsend Investment Group").

The sale of Local was accomplished in a series of documents through which Local offered securities to investors and used the proceeds to redeem Local's stock held by the Colliers.  On August

25, 1997, the Colliers sold all of the issued and outstanding shares of Local's common stock back to Local for $154 million pursuant to a Redemption Agreement (Pls.' Exh. 2). This Redemption Agreement was signed by Sherman, as president of Local, and by the Colliers. Arnold & Porter had no role in drafting or reviewing the Redemption Agreement, and was not a party to it.

To account for the pending FDIC Case, the Redemption Agreement provided for certain "Adjustments Related to FDIC Assistance Agreement" (id. at § 5.1) to be addressed after closing. Ten million dollars of the purchase price would be deposited in an FDIC Assistance Agreement Escrow Account. (Id. at § 5.1(a).) If the Final FDIC Net Resolution Amount (defined as the Final FDIC Claim Resolution Amount offset by the Final FDIC Counterclaim Resolution Amount) required Local to pay the FDIC, the payment would be paid sequentially from the following sources: (1) the FDIC Reserve Account, until exhausted; (2) the FDIC Assistance Agreement Escrow Account, until exhausted; and (3) the Colliers. After full payment, any remaining amounts in the FDIC Reserve Account and the FDIC Assistance Agreement Escrow Account were to be paid to the Colliers. (Id. at § 5.1(b).) If the Final FDIC Net Resolution Amount required the FDIC to pay Local, then that amount plus the amount in the FDIC Reserve Account and the amount in the FDIC Assistance Agreement Escrow Account, plus interest, would be paid to the Colliers. (Id. at § 5.1(c).)

Additionally, the Colliers were "solely and exclusively responsible for all reasonable litigation costs and expenses" incurred by Local in the prosecution, defense, and settlement of the FDIC Dispute. (Pls.' Exh. 2, § 5.1(d).) Local was required to submit all invoices for litigation costs and expenses to an escrow agent, with a copy to the Colliers, along with written instructions to pay the amounts from the FDIC Assistance Agreement Escrow Account. (Id.) If funds were available, they were to be paid from that Escrow Account; if funds were not available in the Escrow Account, the Colliers were required to pay the amounts. (Id.)

In prosecuting the FDIC Claim and defending the FDIC Counterclaim, Local agreed to: diligently and in good faith and on a commercially reasonable basis, prosecute the FDIC Claim and defend the FDIC Counterclaim, and consult in good faith with a representative of the Colliers[4] regarding such prosecution and defense; provide the Colliers with copies of all notices, pleadings, subpoenas, filings, correspondence or other documents received in connection with the FDIC Dispute; provide the Colliers with "full and direct access to all attorneys representing" Local in connection with the FDIC Dispute; give the Colliers adequate prior notice of and the full opportunity to review and comment on all filings, motions or other pleadings with respect to the FDIC

---

[4]Sherman acted as the Colliers' representative until approximately August 1, 2001. That function was then undertaken by Joseph Perkovich.

Case; and use best efforts to maximize the amounts of any payment from the FDIC with respect to the FDIC Claim and minimize the amount of any payment to the FDIC with respect to the FDIC Counterclaim. (Pls.' Exh. 2, § 5.1(e)). Additionally, Local agreed that neither it nor its subsidiaries would take any action to settle, terminate or cease litigation, or to appeal or to decline to appeal, without the prior written consent of the Colliers' representative. (Id.) The parties also agreed to enter into a common interest agreement on customary terms and conditions, at or prior to the closing. (Id.)

On September 8, 1997, a Common Interest Agreement (Defs.' Exh. J) was executed by Townsend on behalf of Local and by the Colliers, so that documents and information relating to the FDIC Case and any future action or proceeding that may arise in connection with the FDIC Case could be exchanged in confidence between and among counsel for Local and counsel for the Colliers. The parties agreed that: Local and the Colliers "share a common interest as against the defendants in the [FDIC] case and third parties"; the attorney-client privilege and the work product doctrine shall apply to all privileged information and work product exchanged between and among counsel for Local and counsel for the Colliers and their respective clients relating to any and all acts, facts, transactions and occurrences that are subject to the FDIC Case, the issues therein, or any matters relating thereto or arising therefrom; and any voluntary exchange of such information and documents between and

among counsel and their respective clients shall not constitute a waiver of any applicable privilege or work product claims that may be asserted as to the information and documents exchanged. (<u>See</u> Defs.' Exh. J, ¶¶ 1-3.) The information and documents subject to the Common Interest Agreement were broadly defined, and the Common Interest Agreement was made retroactive to the commencement of the FDIC Case. (<u>See</u> <u>id.</u> at ¶¶ 4-6.) Both Local and the Colliers authorized Arnold & Porter and any outside counsel, experts or consultants that Arnold & Porter retained to assist in the prosecution of the FDIC Claim or the defense of the FDIC Counterclaim, to accept directions from a Litigation Committee[5] and its designee on all matters concerning the FDIC Case "notwithstanding the fact that such directions may be contrary to the best interests of the Company Parties or the Colliers." (<u>Id.</u> at ¶7.) The Common Interest Agreement was to be governed and construed in accordance with the laws of the State of Oklahoma, without regard to any applicable conflicts of law (<u>id.</u> at ¶9). The sale of Local by the Colliers was to have no effect on the terms of the Common Interest Agreement (<u>id.</u> at ¶10).

**I. Post-Sale Relationship Between Local and the Colliers:**

After the sale, Townsend became Chairman and CEO of Local, and Arnold & Porter continued to represent Local in the FDIC Case. The

---

[5]There is no record evidence that such a Litigation Committee ever existed. Lisa Kelley testified that no such committee was ever formed, and that Bruce Sherman functioned as the committee.

law firm of Fellers, Snider, Blakenship, Bailey & Tippens, P.C. ("Fellers, Snider") became Local's general law firm, with Michael Ford being primary counsel; however, that firm did not represent Local in the FDIC Case.

Two areas of controversy, not related to the FDIC Case, soon arose between Local and the Colliers. These related to several Closing Date Balance Sheet disputes and the Open Hedges losses. In October 1997, Townsend instructed Local's attorneys Fellers, Snider to file suit in Oklahoma state court against the Colliers for breach of the Redemption Agreement. Fellers, Snider filed the lawsuit.

The relationship between Local and the Colliers regarding the FDIC Case was initially uneventful and in accordance with the Redemption Agreement. Arnold & Porter continued to regularly communicate directly with Sherman, as the Colliers' representative, about the FDIC dispute, sometimes in the presence of Local representatives and sometimes alone. Arnold & Porter provided Sherman with what Sherman perceived as legal advice in his capacity as the Colliers' representative, made recommendations as to how the FDIC Case should progress, discussed legal strategy, and recommended how the FDIC Case should be resolved.[6] Sherman had

_____

[6] See, e.g., April 24, 1998 letter from Arnold & Porter regarding possible settlement and the possible consequences to the Colliers on the Redemption Agreement (Pls.' Exh. 9); June 8, 1998 letter from Arnold & Porter regarding settlement meeting (Pls.' Exh. 10). (See generally Pls.' Exhs. 35, 36.)

extensive conversations and meetings with the Arnold & Porter attorneys, and Arnold & Porter continued to seek Sherman's comments before filing documents in the FDIC Case.[7] Additionally, Arnold & Porter sent Sherman correspondence marked "privileged and confidential, attorney-client communication and work attorney work product" without sending a copy to any attorney for Sherman or the Colliers. Sherman testified that no one from Arnold & Porter ever refused to provide him with any requested information, or claimed that information was confidential, or claimed information was protected by the attorney-client privilege. Sherman stated that he had full and direct access to Arnold & Porter attorneys without restrictions. From Arnold & Porter's perspective, Dwyer testified that Local was always its client, it was Local who had contractual duties to the Colliers, and that Arnold & Porter simply assisted its client, Local, in fulfilling these contractual obligations.

Townsend testified that he recognized that the Redemption Agreement committed Local to fulfill certain obligations to the Colliers in connection with the FDIC Case, and he believes those obligations had been fulfilled. Townsend testified that it was not Local's intent to withhold any documents related to the FDIC Case from the Colliers, or to treat such documents as confidential, and that to his knowledge none had been withheld. Townsend further

---

[7]E.g, January 22, 1998 Memorandum from Arnold & Porter requesting review and comment on proposed Reply (Pls.' Exh. 8); March 29, 1999 letter requesting review and comment on motion to compel (Pls.' Exh. 11). (See generally Pls.' Exhs. 35, 36.)

testified it was never Local's intent to limit the Colliers' discussions with the Arnold & Porter attorneys.

Similarly, Carver testified that after the sale of Local, her supervisors at Local instructed her that the Colliers were to receive everything related to the FDIC Dispute. This included full disclosure of information from Arnold & Porter and outside accountants. Carver described the typical information flow as being from the outside person to Local, from Local to Arnold & Porter, and from Arnold & Porter to the Colliers. Carver felt that there was no information which related to the FDIC Dispute which was confidential as to the Colliers.

While there was basic agreement as to these factual matters, there was disagreement as to whether the relationship meant that Arnold & Porter represented Local alone or both Local and the Colliers. Townsend testified forcefully that after the sale, Arnold & Porter represented only Local in the FDIC Case, even though the Colliers had unrestricted access to Arnold & Porter. Sherman asserted just as vigorously that Arnold & Porter represented both Local and the Colliers, and that as the Colliers' representative he had an attorney-client relationship with Arnold & Porter. These competing views seem to have remained largely unarticulated until March 1999, when disputes between Local and the Colliers regarding the FDIC Case intensified, as discussed below.

After the sale of Local to the Townsend Investment Group, Arnold & Porter continued settlement discussions with the FDIC.

During the first part of 1998, Arnold & Porter had numerous discussions and correspondence with both Local and the Colliers as to settlement terms and strategies. By October 1998, however, it was clear that there were significant disputes between Local and the Colliers regarding the FDIC Case.

While Sherman believed that Arnold & Porter represented the Colliers, he was concerned with the quality of the representation. Sherman therefore retained Albert Turkus of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps") to represent the Colliers' interests vis-a-vis Local. Thus, an October 29, 1998 Memorandum from Laura Crawford to Sherman discussed an anticipated meeting with Arnold & Porter to advise Tom Dwyer "that the Colliers' now have counsel involved to represent their best interest, as well as to determine what exactly needs to be accomplished so that this dispute can come to a closure." (Pls.' Exh. 18.) The Memorandum discusses several outstanding issues and disagreements between the position of Local and the position of the Colliers.

In a five-page March 12, 1999 letter, Dwyer addressed a number of issues with Sherman (Pls.' Exh. 19). The letter asserted that Local could not make a settlement offer to the FDIC because there were unresolved disputes between Local and the Colliers as to the amounts owed by the FDIC to Local under the Assistance Agreement. The letter also stated that "Arnold & Porter is not in a position to resolve the ongoing disputes between our clients, the Local

Plaintiffs, and the Colliers, whom you represent."[8]  The letter
continued: "Our only clients in this matter are the Local
Plaintiffs.  We represent and take direction from them.  The
Colliers, whom you represent, are not, and never have been, clients
of Arnold & Porter. . . . [o]ur assistance to our clients in
honoring their contractual relationship with the Colliers does not
establish an attorney-client relationship between Arnold & Porter
and your clients."  (See Pls.' Exh. 19.)  A copy of the letter was
not sent to the Colliers' attorney, Albert Turkus.  This was the
first correspondence with the Colliers specifically addressing the
issue of Arnold & Porter's non-representation of the Colliers.
There was no direct response from Sherman.

**J.  1999 Settlement Agreement:**

By July 1999, Local and the Colliers were preparing a
settlement agreement to resolve their FDIC differences.  This
agreement was negotiated by Fellers, Snider for Local and Skadden,
Arps for the Colliers.  A draft of the settlement agreement was
sent to Arnold & Porter because a portion of the agreement
pertained to Arnold & Porter's representation in the FDIC Case.  In
a July 22, 1999 letter, attorneys from Arnold & Porter responded to
the draft settlement agreement (Pls.' Exh. 20; Defs.' Exh. TT).
Arnold & Porter stated that to date it had represented only Local
in the FDIC Case, and that "the Colliers are not, and never have

---

[8]Sherman is not an attorney.

been, clients of Arnold & Porter." (See Pls.' Exh. 20; Defs.' Exh. TT.) The proposed settlement agreement would change that, and called for Arnold & Porter to represent Local and the Colliers as co-equal joint clients in the FDIC Case. Arnold & Porter stated it could not consent to such an alteration of its existing attorney-client relationship, was not willing to enter into the proposed joint representation, and would not agree to proposed additional litigation restrictions. (See id.)

A July 27, 1999 responsive letter from Fellers, Snider advised Arnold & Porter that, according to counsel for the Colliers, the Colliers were willing to remove the provision relating to the Colliers becoming co-clients of Arnold & Porter and to remove the proposed litigation restrictions (see Pls.' Exh. 21). The language was removed from the ultimate Settlement Agreement.

A Settlement Agreement (Pls.' Exh. 3) between Local and the Colliers was signed in August 1999, but made effective May 27, 1999. This Settlement Agreement resulted in dismissal of the Oklahoma litigation as well as resolution of other disputes related to the Redemption Agreement with respect to the FDIC Case. The Settlement Agreement made "major amendments" to § 5.1, the "Adjustments Related to FDIC Assistance Agreement" portion of the Redemption Agreement. The Settlement Agreement recited that "[c]ertain disputes have arisen between Local Financial and the Colliers as to which of them is entitled to the economic benefit of the Remaining Assistance Amount and how to proceed with

negotiations with the FDIC for the complete settlement of the FDIC Dispute." (Pls.' Exh. 3, p. 4.)  In the Settlement Agreement: the parties amended the definition of "Final FDIC Claim Resolution Amount"; Local represented and warranted that, with a certain proviso, it would not incur any federal or state income tax liability by reason of the settlement of the FDIC Claim; and the parties agreed to reduce the amount of the FDIC Reserve Amount. The Settlement Agreement also "set forth a revised procedure for their proceeding with settlement negotiations with the FDIC in the FDIC Dispute." (Id. at p. 5.)  The parties agreed that: Arnold & Porter would continue to represent Local in the FDIC Case; all legal fees, costs and expenses of the FDIC Case would continue to be paid as set forth in the Redemption Agreement; the parties would diligently, in good faith and on a commercially reasonable basis attempt to resolve the FDIC Dispute as expeditiously as possible and would consult in good faith to accomplish that goal; unless either otherwise requested, each party would be provided with copies of all notices, pleadings, subpoenas, filings, correspondence or other documents received in connection with the FDIC Case and each would have full, complete and direct access to all attorneys directly representing Local or it subsidiaries in connection with the FDIC Case; the parties would be given adequate prior notice of, and the full opportunity to review and comment on, all filings, motions or other pleadings with respect to the FDIC Case, and would use their best efforts to minimize the amount of

any payment to FDIC with respect to the FDIC Counterclaim and to fully resolve the FDIC Dispute as expeditiously as possible; generally, no action to settle, terminate or cease litigation of any claim or counterclaim in the FDIC Dispute, or to appeal or decline to appeal, could be made without prior written consent of both Local and the Collier Parties; and, if necessary, an appropriate common interest agreement would be entered between the parties.  (See Pls.' Exh. 3, p. 5.)

Additionally, Local agreed in the Settlement Agreement that the Colliers would have a one-time unilateral right to change counsel representing Local in the FDIC Case.  (See id. at pp. 8-9.) This would be at such time and in such event that the Colliers deemed appropriate in their discretion, and pursuant to an agreed-upon procedure (id.).  If such new counsel was chosen, the parties agreed to take necessary steps to have the new counsel substituted for Arnold & Porter as their joint counsel in the FDIC Case (id.). The parties further agreed that they would continue to cooperate and would manage the FDIC Dispute on a equal basis as co-clients after new counsel was chosen (id.).  Any further change of counsel had to be made by mutual agreement of Local and the Colliers (id.).

As to settlement of the FDIC Case, Local agreed, with certain provisos, that it would give its written consent to any amount proposed by the Colliers to be paid to the FDIC in full and complete settlement of the FDIC Case and complete resolution and termination of the Assistance Agreement (see Pls.' Exh. 3, pp. 9-

10).  If the conditions in the provisos were not satisfied, then settlement of the FDIC Case could only be by mutual agreement of Local and the Colliers (id.).

Local attached to the Settlement Agreement a copy of all settlement communications regarding the FDIC Case that it had received from Arnold & Porter.  Local further represented and warranted that it would promptly provide the Colliers with copies of all written communications that it sent to, or received from, Arnold & Porter directly or indirectly, concerning the possibility of settlement of the FDIC Case, and would "otherwise keep the Colliers fully informed as to the status of all ongoing settlement discussions with the FDIC of the FDIC Case."  (Id. at p. 10.) Local and the Colliers also agreed that they would take all necessary steps to cause Arnold & Porter to deliver a certain settlement agreement proposal to the Department of Justice (id. at pp. 10-11).

An August 26, 1999 Supplement to Settlement Agreement (Doc. #40-5) made certain changes in recognition of trusts formed by the Colliers.  The relevant obligations of the Settlement Agreement were not changed.

**K.  Post-Settlement Agreement Relationships:**

After the Settlement Agreement between Local and the Colliers, Arnold & Porter resumed its settlement negotiations with the FDIC. Both Fellers, Snider and Skadden, Arps had some involvement in advising Local and the Colliers respectively as to the renewed

-23-

negotiations.[9]  This involvement appears to have been relatively
minimal.

While settlement discussions by Arnold & Porter with the FDIC
continued, the Colliers' relationship with Arnold & Porter became
strained.  Sherman testified that he had always been concerned
about the effectiveness and cost of the representation by Arnold &
Porter.  In October 1999, Sherman asked Lisa M. Kelley née
Gallagher (Kelley), an in-house compliance officer and attorney, to
take the FDIC project away from Laura Crawford, an in-house
accountant, and review documents in their FDIC file.  This action
was triggered by a September 30, 1999 invoice from Arnold & Porter
which had, according to Kelley, "infuriated" Sherman because of its
amount.  Kelley was instructed to go through the invoice, contact
Arnold & Porter, identify herself as the new liaison between the
law firm and Sherman, get brought up to speed on the FDIC Case, get
an accounting of the time on the invoice, and get the FDIC Case
settled.  Kelley was not given prior attorney fee invoices to
review.

In a seven-page, single-spaced November 13, 1999 letter to
Arnold & Porter, Kelley introduced herself, asserted the attorney-
client privilege for the contents of the letter, indicated a desire
to discuss a broad-ranging set of issues with Arnold & Porter, and
posed twenty-two questions about the September 30, 1999 Arnold &

---

[9]See, e.g., September 1, 1999 letter of Skadden, Arps to
Fellers, Snider (Pls.' Exh. 22).

Porter invoice (see Kelley Dep., Exh. B). On November 30, 1999, a conference call of several hours' duration was held between Kelley and three Arnold & Porter attorneys (see Pls.' Exh. 5, pp. 7-11). They discussed the issues listed in Kelley's letter, and from Kelley's perspective, the Arnold & Porter attorneys provided legal advice and discussed work product information in a wide-ranging discussion of the FDIC Case. The Arnold & Porter attorneys discussed that there was a likely shortfall between what the FDIC would settle for and the amounts in the escrow and reserve accounts, and attempted to determine a value for the FDIC Claim as an offsetting amount. Arnold & Porter asked for certain financial information, and agreed to take the information, formulate a settlement strategy, and arrange a settlement conference with the FDIC as to both the FDIC Counterclaim and the FDIC Claim.

Kelley also told the Arnold & Porter attorneys, as directed by Sherman, that they were failing to move the FDIC Case along expeditiously and it was costing the Colliers a lot of money. Kelley discussed Sherman's concerns about the attorneys' fees, including their size, the billing rates, and accountability.

During the November 30 call no information was withheld by Arnold & Porter. Kelley's sense of it was that the Arnold & Porter attorneys were pleased that someone from the Colliers was taking an active interest and wanted to move the case forward. Arnold & Porter provided the information requested by Kelley to bring her up to speed on the case.

On December 22, 1999, Arnold & Porter sent Kelley various documents, including a 70-page draft Memorandum containing a legal analysis of the tax-benefits contract claim (the FDIC Claim) (<u>see</u> Pls.' Exhs. D, E). This became the basis for Kelley's knowledge about the case.

In letters both before and after the November 30 conference call (November 18, 1999 and January 19, 2000), Kelley, as counsel for the Colliers and Sherman, directed the Escrow Agent not to pay invoices submitted by Arnold & Porter for legal fees (<u>see</u> Pls.' Exhs. 3, 4). In a February 1, 2000 responsive letter, Fellers, Snider took the position that the Colliers could not address objections about Arnold & Porter's invoices to either Arnold & Porter or the Escrow Agent because the Colliers had no attorney-client relationship with Arnold & Porter and there was no requirement under the Redemption Agreement for Local to obtain the Colliers' approval to pay the invoices (<u>see</u> Pls.' Exh. F).

This response was not well-received by Sherman, and in a February 3, 2000 fax Kelley advised Arnold & Porter, in part, that Local's positions were interfering with the possibility of settlement with the FDIC and running the risk that Sherman would exercise the Colliers' unilateral option of terminating Arnold & Porter (Pls.' Exh. G). The Fellers, Snider letter was not discussed by Kelley with Arnold & Porter, and Kelley testified that no one from Arnold & Porter ever said to her that Arnold & Porter did not represent the Colliers.

Kelley viewed herself as Arnold & Porter's client since she was the Colliers' designee.  Initially, she believed this because that was what she had been told by Sherman; subsequently, because that was how she perceived the relationship based on the day-to-day contacts.  Additionally, the Colliers were not represented by any other law firm with respect to the FDIC Case, and Skadden, Arps was not involved in any of the activities in which Kelley was involved.  Kelley testified that during her ensuing relationship with Arnold & Porter she was given full access to Arnold & Porter attorneys, and they worked extremely well together.  Dwyer's testimony did not dispute these basic facts, but disagreed that an attorney-client relationship existed with anyone other than Local.

Arnold & Porter continued to negotiate a settlement with the FDIC, and kept both Local and the Colliers apprised of the progress by telephone conversations, electronic mail (e-mails), and correspondence.[10]  A settlement conference with the FDIC took place in Washington, D.C. on October 19, 2000, attended by Sherman and Kelley and two Arnold & Porter attorneys, but at Arnold & Porter's suggestion, no representative of Local.  Sherman viewed this as evidence that the Colliers were a client; Dwyer testified that Sherman wanted to settle the FDIC Counterclaim for a lesser amount,

---

[10]See, e.g., Arnold & Porter fax of February 14, 2000 (Pls.' Exh. H); Dwyer e-mail of March 29, 2000 (Pls.' Exh. 5); Dwyer e-mail of May 26, 2000 and replies of May 31, 2000 (Pls.' Exhs. I, J, K. L, M); Dywer e-mails of October 24 and 30, 2000 (Pls.' Exhs. S, T); Karron e-mails of July 24, 25, 2001 (Pls.' Exhs. O, P, Q).

so Sherman was allowed to attend the meeting to see for himself if such an amount was feasible.  The government would not settle the FDIC Claim, and from the discussion it became apparent that the government's settlement position as to the FDIC Counterclaim was such that there would be about a $2.1 million shortfall in the money which was available from various designated accounts.

Sherman wanted Local to contribute money to this shortfall. E-mails on October 24 and 30, 2000, from Arnold & Porter to Kelley summarized their prior telephone conversation and outlined a revised possible settlement approach in which the $2 million shortfall would not have to be paid until the FDIC Claim was decided (see Pls.' Exhs. S, T).  It soon became clear, however, that the Colliers and Local had fundamental disagreements, especially as it related to who would pay the $2.1 million shortfall.[11]

A November 8, 2000 letter from Arnold & Porter to the FDIC attorney, with copies to both the Colliers' representatives and Local, conveyed certain requested settlement information to the FDIC, including Local's state and federal tax returns for the calendar year ending December 31, 1999 (see Pls.' Exh. U).

---

[11]See, e.g., October 26, 2000 letter from Townsend to Sherman (Pls.' Exh. 27); November 6, 2000 letter from Sherman to Townsend (Pls.' Exh. 28); December 4, 2000 letter from Townsend to Sherman (Pls.' Exh. 7).

**L. Colliers' Change of Personnel:**

On August 1, 2001, prior to any specific settlement offer from the FDIC, Sherman ceased being the Colliers' representative, and his position was assumed by Joseph Perkovich.[12]  (See Pls.' Exh. 6, p. 82).  Kelley stopped her activities in connection with the FDIC Case on that date as well and turned her files over to Perkovich, at his request.  Arnold & Porter immediately began dealing with Perkovich concerning the FDIC Case, forwarding proposed court filings for his review.  (Pls.' Exh. 26.)

On or about August 9, 2001, Perkovich retained the law firm of Hunton & Williams LLP ("Hunton & Williams") to oversee Arnold & Porter in the FDIC Case litigation on behalf of the Colliers,[13] and provided them with the eight boxes of files he received from Kelley.  Attorney Abigail C. Watts-FitzGerald (Watts-Fitzgerald) took the lead role for Hunton & Williams.  Hunton & Williams' view was that it did not represent the Colliers in the FDIC Case but rather, served as a conduit between Arnold & Porter and the Colliers.  The evidence establishes, however, that attorneys for Hunton & Williams had several direct contacts with Department of Justice attorneys in an attempt to settle the FDIC Case.  (See,

---

[12]Perkovich has a law degree and masters degrees in taxation and estate planning, and was a Certified Public Accountant (CPA). He let his law and CPA licenses expire.  Perkovich was never licensed to practice law in Florida.

[13]Hunton & Williams had represented the Colliers in a number of other matters for a number of years.

e.g., Defs.' Exh. P.)  These relatively few contacts seem to have had little positive effect on the negotiations, but rather chiefly served to confuse lines of communications.  Hunton & Williams also represented the Colliers in their other disputes with Local.

After Watts-FitzGerald became involved, Arnold & Porter would provide her with copies of documents, and provide their legal opinions in response to her questions.  The Arnold & Porter attorneys would also directly contact Perkovich and discuss the FDIC Case.  Watts-FitzGerald was of the opinion that the Colliers were relying upon Arnold & Porter as their attorney in the FDIC Case (see id.).  Watts-FitzGerald acknowledged, however, that between August 2001 and December 2002, lawyers at Arnold & Porter consistently told her that Arnold & Porter was not the lawyer for the Colliers and would not accept a joint representation of the Colliers.

**M.  Summary Judgment on FDIC Claim Liability:**

On March 27, 2002, the United States Court of Federal Claims entered summary judgment as to liability on the FDIC Claim, holding that the United States breached the implied covenant of good faith and fair dealing by enacting the Guarini legislation.  Local Am. Bank v. United States, 52 Fed. Cl. 184 (2002) ("Local I").  The amount of damages owed to Local by the FDIC was left to be resolved at a latter time.

**N. Second Supplement to Settlement Agreement:**

On September 17, 2002, in anticipation of settling the FDIC Counterclaim, Local and the Colliers entered into a Second Supplement to Settlement Agreement (Defs.' Exh. MMM).[14]  In the Second Supplement, the parties agreed that they would make a $19 million interim payment to the United States government in order to cease the accrual of interest and penalties while the parties pursued final settlement of the FDIC Counterclaim (id. at p. 2). The parties continued to agree to cooperate with each other to negotiate in good faith a settlement of the FDIC Claim and FDIC Counterclaim (id. at p. 3).  The parties also continued to agree that the Colliers would be liable for payment of attorneys' fees and costs in the FDIC Case and FDIC Counterclaim, and that Arnold & Porter would continue to be the primary negotiator with the government (id.).  The parties further agreed that "[a]t all times, Arnold & Porter, as counsel for Local, shall continue to communicate in a timely and meaningful manner with counsel for the Colliers and seek their input, as well as Local's, on decisions pertaining to litigation or settlement with the U.S. Government." (Id.)  The Colliers were given the right to request that Thomas Dwyer and Kent Yalowitz be the primary Arnold & Porter attorneys on the FDIC Case (id.).  Local and the Colliers agreed to negotiate a fee arrangement with Arnold & Porter mutually acceptable to Local

---

[14]Hunton & Williams represented the Colliers on this agreement.

and the Colliers for continued prosecution of the FDIC Claims and FDIC Counterclaim (Defs.' Exh. MMM, p. 3). A billing procedure was established wherein Arnold & Porter would bill Local, with copies to a representative of the Colliers, and a procedure for resolution of billing disputes was established (id.).

**O.  Settlement and Termination Agreement with FDIC:**

On December 30, 2002, Local and the FDIC signed a Settlement and Termination Agreement (Doc. #40-7, pp. 16-32) that terminated the Assistance Agreement and settled the FDIC Counterclaim, but left unresolved the FDIC Claim and the interest offset issue. Under the Settlement and Termination Agreement, Local was required to pay $24,660,404 to the FDIC ($20,047,249 in tax benefit sharing payments, plus $7,718,893 in prejudgment interest, less $3,105,738 already collected by FDIC) (see id. at pp. 18-19). Arnold & Porter negotiated the settlement with the Department of Justice. In due course, Local remitted the FDIC Counterclaim settlement amount to the FDIC.

**P.  Resolution and Modification Agreement:**

Also effective December 30, 2002, Local and the Colliers entered into a Resolution and Modification Agreement (Defs.' Exh. NN) which, with certain exceptions, superceded the Redemption Agreement and the Settlement Agreement, as supplemented. The Resolution and Modification Agreement was negotiated between Michael Ford (for Local) and Watts-FitzGerald (for the Colliers);

Arnold & Porter had no direct role in the negotiation or drafting of the Resolution and Modification Agreement.

The Resolution and Modification Agreement established sources and procedures for payment of the FDIC Counterclaim settlement amount (see Defs.' Exh. NN, p. 2). Additionally, the parties agreed to continue to cooperate with each other to negotiate in good faith a settlement of the FDIC Claim (see id. at p. 3). Local and the Colliers further agreed that as of the date of the payment of the FDIC Counterclaim amount and all outstanding attorneys' fees to Arnold & Porter, the Colliers would have sole authority, in their sole discretion and without the consent of Local, to instruct Local as to how the FDIC Claim should be settled, terminated, ceased, or appealed (see id.). Local was given a ten percent interest in any proceeds (see id. at pp. 3-7). The Resolution and Modification Agreement also provided the disposition procedure for any proceeds from the FDIC Claim (see id.).

Under the Resolution and Modification Agreement, some provisions of the Redemption Agreement, Settlement Agreement, First Supplement, and Second Supplement were amended and continued in full force as amended (id. at pp. 8-9). The parties continued to agree that the Colliers would be solely and exclusively liable for payment of attorneys' fees and costs in connection with the FDIC Claim (id. at p. 9). Local agreed to submit all invoices to the Colliers for payment; to diligently and in good faith pursue the

FDIC Claim and consult in good faith with the Colliers regarding such prosecution and litigation strategy (see Defs.' Exh. NN, p. 10); to provide the Colliers with copies of all notices, pleadings, subpoenas, filings, correspondence or other documents received in connection with the FDIC Claim and with full and direct access to all attorneys representing Local in connection with the FDIC Claim; to give the Colliers adequate prior notice of and the full opportunity to review and comment upon all filings, motions and other pleadings with respect to the FDIC Claim (see id.); and to use best efforts to maximize the amounts of any payment from the FDIC regarding the FDIC Claim. Local agreed not to settle, terminate or cease litigation of the FDIC Claim, or appeal or decline appeal, without prior written consent of the Colliers (see id.).

The parties also agreed that Arnold & Porter would continue to be the primary negotiator with the government on the FDIC Claim, subject to a replacement provision (see id.). The parties further agreed that "[a]t all times, Arnold & Porter, as counsel for Local, shall continue to communicate in a timely and meaningful manner with counsel for the Colliers and seek their input, as well as Local's, on decisions pertaining to litigation or settlement with the United States Government." (Id.) The Colliers were given the right to request that Thomas Dwyer and Kent Yalowitz be the primary Arnold & Porter attorneys on the FDIC Case (see id.).

The parties further agreed that Arnold & Porter would continue to issue its fee statements on the FDIC Claim directly to its client, Local, with a copy to the Colliers (see Defs.' Exh. NN, p. 10). The Colliers were given the right to review and approve the attorney fee statements, and were responsible for payment of the fees (see id.). A procedure was established to resolve attorney fee disputes between the Colliers and Arnold & Porter (see id. at pp. 9-11).

Local additionally agreed that the Colliers would have a one-time unilateral right to change counsel representing Local in the FDIC Claim (see id.). This would be at such time and in such event that the Colliers deemed appropriate in their discretion, and pursuant to an agreed-upon procedure (see id.). If such new counsel was chosen, the parties agreed to take necessary steps to have the new counsel substituted for Arnold & Porter as their joint counsel in the FDIC Claim (see id.). The parties further agreed that they would continue to cooperate and would manage the FDIC Claim on an equal basis as co-clients after new counsel was chosen (see id.). Any further change of counsel had to be made by mutual agreement of Local and the Colliers (see id.).

**Q. Local's 2003 Tax Deductions:**

As it relates to this case, the year 2003 was notable because certain tax deductions were taken by Local that year. No one at Local made the Colliers aware of these tax deductions and the

associated benefits.  The disclosure of the deductions by Carver in 2006 constitutes the bulk of the allegedly privileged and confidential information given by Carver to the Colliers.

**(1) Attorneys' Fees Deduction:**

In 2003, Local filed amended tax returns for 1999 through 2002, taking a tax deduction for tax years 1997 through 2002 for the attorneys' fees paid to Arnold & Porter during the course of the FDIC Dispute.  Carver testified that Dwyer had advised her such a deduction was legal and appropriate even if the attorneys' fees had been paid by the Colliers.  Dwyer confirmed this, adding that he also said this was a proper deduction unless there was a contractual obligation to the contrary.  After discussing the matter with Richard Park (Park), Local's Chief Financial Officer (CFO), Park and Carver decided that if there was a viable tax position, Local would take the deduction on its tax return.  The tax benefit of such a deduction to Local was approximately 35% of the amount of the attorneys' fees.  Park instructed Carver not to discuss this matter with the Colliers.

**(2) Principal Payments Deduction:**

In 2003, while the FDIC Claim was still being litigated, Carver spearheaded internal discussions of whether Local could obtain a tax advantage from the FDIC Counterclaim settlement.  Carver testified that she and Park had discussions as to whether Local could file an amended 2002 federal tax return claiming a

deduction for the principal payments made pursuant to the FDIC Counterclaim settlement.[15]  Carver took the lead on investigating this possibility.  This was the same issue previously discussed in 1997, which caused the write-off of a $3 million asset upon the determination that there was no basis for a deduction of principal payments.

When Carver told Dwyer that she wanted to deduct the principal payments, Dwyer thought she was crazy and stated that he did not think there was a tax basis to do so.  Dwyer felt that it would not be appropriate for Arnold & Porter to do the work to determine if the principal payments were deductible, and referred Carver to Patrick Mitchell (Mitchell), an attorney at Jenkens & Gilchrist. Carver called Mitchell, and it was decided that Jenkens & Gilchrist would generate a tax opinion on the issue.  The tax opinion issued by Jenkens & Gilchrist opined that there existed substantial authority to support Local taking a $20 million deduction. (Pls.' Exh. 10.)

Carver testified that there was a lot of discussion between herself, Dwyer and Mitchell about the methodology of taking the deduction, and it was ultimately decided to avoid a justification that relied upon the Guarini claim or the FDIC Counterclaim.  The

---

[15]The tax benefit of the interest deduction had already been passed on to the Colliers in the form of proceeds credited towards the settlement of the FDIC Counterclaim.

deduction was approximately $20 million, which had a tax benefit of approximately $7 million.

Carver testified that neither she nor Dwyer thought it was fair and equitable for Local to take the principal deduction and not pass the tax benefits through to the Colliers.  Carver's understanding was that Local was to pass the benefits associated with both deductions to the Colliers.  Carver also testified, somewhat inconsistently, that she believed that the Colliers had released whatever claim to tax benefits they had when they signed the Resolution and Modification Agreement.  Park concluded that the tax benefit on the principal payment did not need to be passed through to the Colliers, and instructed Carver not to talk about it with any of the Colliers' representatives.

**(3) Excess Tax Basis:**

In the tax returns it originally filed, Local did not differentiate between book basis and tax basis, considering both to be the same.  In March 2003, Local filed an amended tax return for its tax year ending June 30, 1999, which claimed an excess basis deduction that was equal to the tax basis that existed on the date of acquisition of the failing thrift, Community Federal Savings & Loan Association.  The deduction was for $20 million, and had approximately a $7 million tax benefit to Local.  All of the excess basis was captured in the amended tax return.

Arnold & Porter sent a copy of this amended tax return to the attorney for the FDIC by a cover letter dated March 31, 2003 (see Pls.' Exh. 14).  The cover letter and a copy of this amended tax return were also sent to Perkovich and Watts-FitzGerald by fax transmittal on March 31, 2003 (see Pls.' Exh. 14).  Watts-FitzGerald testified she received the letter and amended tax return, but did not discuss it with anyone.  Carver testified that this cured her concern over non-disclosure of excess basis to the Colliers.

**R.   The FDIC Claim and the Sale of Local:**

On February 26, 2004, and April 9, 2004, the Court of Federal Claims awarded Local $5,883,296 as tax benefits lost as a result of the passage of the Guarini legislation.  Local Okla. Bank, N.A. v. United States, 59 Fed. Cl. 713 (2004) ("Local II").  The government appealed this decision.

In May-June, 2004, Townsend's group sold Local in a private sale for approximately $384 million to International Bancshares Corporation (IBC).  On August 31, 2005, Carver signed an International Bancshares Corporation Code of Ethics.  (See Carver Dep., Exh. 10.)  This provided, among other things, that Carver would "[t]ake all reasonable measures to protect the confidentiality of non-public information about IBC or its subsidiaries and their customers obtained or created in connection with your activities and to prevent the unauthorized disclosure of

such information unless required by applicable law or regulation or legal or regulatory process."  (See Carver Dep., Exh. 10, p. 3.) Carver recognized that she was bound to adhere to the provisions of the Code of Ethics.

On June 29, 2006, the decision of the Court of Federal Claims awarding $5.8 million was affirmed by the Federal Circuit.  Local Okla. Bank, N.A. v. United States, 452 F.3d 1371 (Fed. Cir. 2006). As a result, Local was called upon to distribute the proceeds to be received from the FDIC.  The anticipated distribution of the $5.8 million brings us at long last to the facts immediately surrounding the issues in the pending motion.

## II.

In the first part of July 2006, Carver left IBC because, at least in part, she became unhappy with her compensation.  On July 26, 2006, Dwyer drafted a "Privileged and Confidential Attorney-Client Communication Memorandum" to Jon Nixon (Nixon), General Counsel of IBC, with a proposed distribution allocation of the $5.8 million pursuant to his review of the Resolution and Modification Agreement.  (Pls.' Exh. 90.)  Dwyer sent a copy of the memorandum by e-mail to Watts-FitzGerald on August 8, 2006.  (Id.)

In August 2006, Carver called a representative of the Colliers to notify them of her departure from IBC and to inform them that she should not be sent information about matters on which she had previously worked.  At about the same time, Perkovich and

Watts-FitzGerald also heard that Carver had left IBC.  Perkovich wished to retain Carver to consult with the Colliers regarding the distribution of the $5.8 million from the FDIC because he was not comfortable with the distribution proposed by Dwyer.  Thus, Perkovich arranged for a telephone conference with Carver.

During a thirty-minute call on August 16, 2006, Perkovich stated that he wished to hire Carver to work on the Colliers' behalf in connection with allocation of the Guarini claim proceeds awarded by the federal court.  Carver agreed, and they agreed in principle to an hourly rate.  Carver then informed Perkovich that she could not work for him in good conscience unless he understood that there were actions taken by Local that she believed to be improper.  Carver did not discuss specifics, but told Perkovich that the magnitude of these actions was $15-20 million.

On August 21, 2006, Carver held a thirty to sixty-minute telephone call, first with Perkovich alone and then in a conference call with both Perkovich and Watts-FitzGerald.  During this conference call, they discussed that Carver had been asked to work for the Colliers to assist in the allocation of the $5.8 million Guarini money, and that Carver had told Perkovich she could not in good conscience take this work without disclosing that there were certain tax benefits, taken by Local, that should have been credited to the Colliers.  Watts-FitzGerald stopped Carver at that point, stating that Carver should not disclose attorney-client

privileged information.  Watts-FitzGerald asked Carver if she was subject to any confidentiality or similar agreements.  Carver responded that the bank had a code of ethics, the contents of which Carver did not recall, but that she did not recall being subject to any confidentiality or other restrictive agreements.  The participants then had a brief, general conversation in which Carver stated that there were three categories, or "buckets," of tax deductions that Local had taken, which Carver felt belonged to the Colliers.  Perkovich asked Watts-FitzGerald to call Carver back the next day to get more information.  Watts-FitzGerald testified that at that time, she felt that an employee did not have a fiduciary obligation to an employer, but conceded that she did not inquire as to Carver's position within Local.  Watts-FitzGerald also testified that she did not think confidentiality was an issue because there was a binding contract giving the Colliers free access to everything dealing with the Colliers.

Watts-FitzGerald called Carver on August 22, 2006.  Carver discussed the three "buckets" in more detail, identifying them as (1) legal fees paid to Arnold & Porter with regard to the FDIC Case, which Local had deducted on its federal tax returns; (2) payments of principal made by the Colliers from the escrow account to the FDIC, which Local had deducted on its federal tax returns; and (3) certain of Local's assets which had an excess tax basis compared to their book basis, which Local had deducted on its federal tax return.  Carver stated that she felt the Colliers were

entitled to the benefits of these deductions. Watts-FitzGerald recognized that Carver's statements created at least a potential adversarial relationship between Local and the Colliers.

Pursuant to the August 21 conversation, an Independent Contractor/Confidentiality Agreement was drafted by Perkovich and reviewed by Watts-Fitzgerald. (Defs.' Exh. Q.) The agreement provided that Carver would be paid at a rate of $400 per hour for work related to Guarini and a related interest offset matter, and that the parties anticipated entering into additional agreements for "other services" after further discussion. The "other services" referred to the three tax "buckets" that Local had failed to disclose to the Colliers.

On August 31, 2006, Perkovich sent a letter to Nixon at IBC acknowledging receipt of Dwyer's July 26, 2006 allocation of the $5.8 million. Perkovich advised Nixon that the Colliers had "retained Kristy Carver as our consultant effective August 16, 2006, to advise the Colliers thereon. We understand that Kristy's employment with IBC ended last July." (Defs.' Exh. SSS.) A copy of this letter was sent by Watts-FitzGerald to Arnold & Porter on September 13, 2006. (Id.)

Also on August 31, 2006, Carver met with Perkovich and Watts-FitzGerald (and attorney Vance Salter [Salter] by conference call) in Naples, Florida, for a couple of hours. The purpose of the meeting was to decide whether there would be a separate retention

of Carver with regard to the three undisclosed tax "buckets."
Salter instructed Carver not to discuss conversations she had had
with Arnold & Porter attorneys. Carver's recollection was that the
attorney-client privilege was discussed and she was instructed not
to talk in detail about conversations she had had directly with
Arnold & Porter attorneys. Watts-Fitzgerald again asked if Carver
was subject to a confidentiality or other agreement, but received
no more definitive an answer than she had previously. Carver
discussed Guarini and the allocation of the money, and the three
tax "buckets" that Carver believed had been wrongfully withheld
from the Colliers. More specifically, Carver described the tax
treatment taken by Local of the attorneys' fees deduction, the
excess tax basis issue in the various amended tax returns and the
settlement payment; Local's first amended tax return; statements by
CFO Park that Carver should not worry about the Colliers if the
legal fees position was a valid position; that Park and Townsend
were concerned about disclosure to the Colliers; that Park told
Carver not to disclose these matters to the Colliers; that Dwyer
and/or Yalowitz knew about the three items deducted; that Local had
hired the outside law firm of Jenkens & Gilchrist and Patrick
Mitchell to provide advice about the principal payment deduction
and that Carver had directed the efforts of Jenkens & Gilchrist to
find a basis for the deduction; and that Local took the deduction.
Perkovich and Watts-FitzGerald asked if Arnold & Porter knew about
the deductions, and Carver confirmed their knowledge.

Near the end of the August 31 meeting, Carver raised the possibility of being paid on a contingency fee basis as to the three non-disclosures. Perkovich asked Salter if a contingency fee was permitted, and Salter responded that such an arrangement would impact Carver's credibility as a witness but was not prohibited. Carver testified that Watts-FitzGerald had mentioned that the Colliers had been attempting to convince Arnold & Porter to work on a contingency fee basis of 20% of any actual recovery, and Carver adopted that percentage for herself as well. Carver was also concerned about the possibility of being sued by Local because of the disclosures, and asked the Colliers to provide legal representation if that occurred. The Colliers initially declined to do so.[16]

On September 7, 2006, Perkovich sent Carver an Addendum to Independent Contractor/Confidentiality Agreement (Defs.' Exh. X), with a copy to Watts-FitzGerald. The Addendum proposed retaining Carver in connection with undisclosed tax benefits or other possible claims against Local. Carver's compensation would be 20% of any cash recovery. Carver made some changes to the agreement and the addendum and returned a draft to Perkovich. The agreement included the requirements that Carver keep the Colliers' information confidential and refrain from working for Local or providing services that would constitute a conflict of interest

___

[16]Carver was sued by Local in December, 2006, and the Colliers did pay for Carver's representation.

with the Colliers.  Carver had deleted a provision in which she would have warranted that she was not under a prior confidentiality agreement with Local.  Carver testified that she did so because she did not know for certain whether she had signed such an agreement and did not have a copy of any such agreement.  Perkovich testified that he viewed this as a business matter rather than a litigation matter, because he believed the new owners of Local (Nixon) would recognize their error and pay the money to the Colliers.

In a September 12, 2006 e-mail, Carver made proposed changes to the Independent Contracting Agreement and Addendum.  (Defs.' Exh. A.)  Perkovich made additional changes, which he sent to Carver by e-mail on September 15, 2006.  (Defs.' Exh. CC.)  The Independent Contractor/Confidentiality Agreement regarding the $5.8 million allocation was executed on September 15, 2006.  (Defs.' Exh. AA.)  An Addendum (Defs.' Exh. GG) was signed on September 17, 2006, and provided for a contingency fee of 20% of any recovery on the non-Guarini claims.

By letter dated September 18, 2006, Nixon responded to Perkovich's August 31, 2006 letter, with a copy to Carver.  (Defs.' Exh. BB.)  Nixon stated that Carver was in possession of privileged and confidential tax, legal, and financial information concerning IBC and its predecessors; that Carver had a continuing contractual and fiduciary obligation to maintain the confidentiality of the information; and that Carver was not authorized to convey any such

information to anyone.  Nixon further stated that subject to these limitations, IBC did not object to Carver advising the Colliers if the advice was limited to the proper allocation of the $5.8 million.  IBC reserved all of its rights against all parties in the event there were unauthorized disclosures.

On September 18, 2006, Perkovich sent a letter to Nixon after conducting a preliminary review of Dwyer's allocation analysis. (Defs.' Exh. XX.)  Perkovich advised in part that the Colliers had "recently become aware that there are certain tax benefits relating to the transactions which were not previously disclosed to the Colliers," the economic benefit of which may be due the Colliers. This statement was based upon the information provided by Carver, who had also made suggestions about the letter's content (Defs.' Exh. DD).

Nixon responded to this letter by a letter dated September 22, 2006 (Defs.' Exh. HH).  Nixon asserted that the only obligations remaining between the Colliers and IBC were those set forth in the Resolution and Modification Agreement dated December 30, 2002, which completely superceded the Redemption Agreement and the Settlement Agreement.  Nixon asserted that all claims except the current $5.8 million allocation had been released by the Resolution and Modification Agreement.  Nixon also reiterated his assertion of confidentiality as to Carver.

Nixon's September 22 letter was forwarded to Watts-FitzGerald for review, and Carver contributed information to the response. (Defs.' Exh. JJ.)  Carver discussed the FDIC dispute with attorney Terry A. Moore (Moore), one of plaintiffs' counsel, on October 4, 2006.  (Defs.' Exh. G.)  In an October 5, 2006 e-mail, Carver sent Watts-FitzGerald a Code of Ethics from the IBC website and a copy of the documents that everyone signed when IBC merged with Local. (Defs.' Exh. II.)  Watts-FitzGerald made a brief response by letter dated October 6, 2006 (Defs.' Exh. KK), in which she asked for a copy of Carver's confidentiality agreement and suggested a meeting later in the month.

On October 20, 2006, the two Collier corporations filed suit against IBC in the United States District Court for the Middle District of Florida, Fort Myers Division, Case No. 2-06-cv-571. The claims included breach of the Redemption Agreement, breach of fiduciary duty, constructive fraud, fraud in the inducement with regard to the 2002 Agreement, and for declaratory relief regarding IBC's claim of release.[17]  The case was filed by the Hunton & Williams law firm, which was later joined by the plaintiffs' counsel in the present case.

In a November 3, 2006 letter to Carver (Defs.' Exh. G), Moore stated:

---

[17]In May, 2007, this case was transferred to the Western District of Oklahoma.

This letter shall confirm the general discussion we had with you on October 4, 2006, prior to discussing matters involving the FDIC dispute. At the commencement of that telephone conversation, I identified that our office represents Collier Family Office, Inc. in connection with a dispute with IBC formally [sic] known as Local Financial. It is my understanding that you were employed by them. I do not represent IBC/Local or you in this matter.

It is my understanding that you are not represented by counsel for IBC. However, it is my understanding that you are represented by legal counsel and you may desire, and are entitled, if you choose, to have this counsel involved in this conversation or any future conversation. I am interested in discussing certain matters with you to more fully understand certain facts regarding this dispute. I do not want you to disclose any privileged communications or conversations you had with any legal counsel representing IBC/Local: At this time, this includes conversations or communications with attorneys including Arnold & Porter and/or Thomas Dwyer; Fellers, Snider; Jenkens & Gilchrist; and other attorneys relating to the FDIC dispute. Our initial review of the documents is that Arnold & Porter and Thomas Dwyer were legal counsel or had a special duty to both IBC and the Colliers in the FDIC dispute. IBC, Arnold & Porter, and Thomas Dwyer had an obligation to share all information with the Colliers and make full disclosure of all relevant matters to the Colliers in this dispute. The duties and relationship between Arnold & Porter, Thomas Dwyer, IBC and the Colliers will be more fully defined in the future.

This letter was "acknowledged" by Carver's signature.

On December 8, 2006, IBC sued Carver in Oklahoma state court. This action was dismissed on July 2, 2007.

In a December 18, 2006 letter to Carver, Perkovich indicated that the Colliers' legal counsel advised that the contingency fee arrangement in the Addendum "is not legally appropriate," and

therefore the Addendum must be terminated. (Defs.' Exh. H.) A Termination of Addendum was executed by both parties. (Id.)

On March 16, 2007, plaintiffs filed their original Complaint in state court, which was ultimately removed to federal court, Case No 2:07-cv-387. The operative pleading is the Second Amended Complaint (Doc. #40). On June 22, 2007, plaintiffs filed a Verified Complaint for Declaratory Relief in state court, and this too was removed to federal court, Case No. 2-07-cv-420. The Court finds that substantial portions of the factual information set forth in the Second Amended Complaint originated from information provided by Carver, as summarized above.

## III.

As previously noted in this Opinion and Order (pp. 2-3), this Court has the inherent power to impose sanctions on both parties and their lawyers if there is a showing of bad faith[18] and to manage the conduct of litigation before it. Lawyer misconduct may be sanctioned, even when it effectively penalizes the client, if the client is aware of or directs the offending conduct. Sahyers v. Prugh, Holliday & Karatinos, P.L., 560 F.3d 1241, 1245 (11th Cir. 2009). The ethical obligations of counsel are generally greater

---

[18]The Court rejects defendants' argument that a "reasonable possibility" that "impropriety in fact occurred" is alone sufficient to trigger sanctions, particularly the severe sanctions defendants now seek (Doc. #66, p. 14). "The key to unlocking a court's inherent power is a finding of bad faith." Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306 (11th Cir. 2009) (citation omitted.)

than the lawyer's duties to a client.  <u>Sahyers</u>, 560 F.3d at 1245 n.7.

Defendants assert that plaintiffs' counsel violated their ethical obligations by inducing Carver to disclose information protected by the attorney-client privilege, as well as other confidential information.  This, defendants assert, violated Rule 4-4.2 and Rule 4-4.4 of the Rules Regulating The Florida Bar. (Doc. #66, pp. 16-20.)  Rule 4-4.2 provides in pertinent part:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. . . .

R. Regulating Fla. Bar 4-4.2.  Rule 4-4.4 provides in pertinent part:

> In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person.

R. Regulating Fla. Bar 4-4.4.  The Official Comments to Rule 4-4.4 makes clear that a lawyer may not disregard "legal restrictions on methods of obtaining evidence . . . [such as] unwarranted intrusions into privileged relationships, such as the client-lawyer relationship. . . ."

**A.  Contacts with Carver, Rule 4-4.2:**

The Court finds that Perkovich did not engage in improper behavior when he contacted Carver after the termination of her

employment with Local. Even if the ethical requirements applied to an attorney who was not a member of The Florida Bar and was functioning in a business capacity, Rule 4-4.2 allows the parties to communicate directly with each other. Ellis Rubin, P.A. v. Alarcon, 892 So. 2d 501, 503 (Fla. 3d DCA 2004).

It is also clear that there was no ethical violation when plaintiffs' counsel thereafter participated in conversations and interviews of Carver. An attorney may ethically communicate with a former officer or employee of a corporation on an *ex parte* basis even though the attorney knows that the corporation is represented by counsel. H.B.A. Mgmt. v. Estate of Schwartz, 693 So. 2d 541 (Fla. 1997). The evidence is undisputed that Carver was no longer employed by Local or its successors at the time contact was initiated by Perkovich or the Colliers' counsel, and Carver had no present authority to speak for or bind Local/IBC. "H.B.A. Management held that [Rule] 4-4.2 does not apply when the witness is no longer employed by the opposing entity in the lawsuit. . . . Hence under H.B.A. Management, [Rule] 4-4.2 could not be violated by the communications." Allstate Ins. Co. v. Bowne, 817 So. 2d 994, 997 (Fla. 4th DCA 2002). Therefore, the Court rejects defendants' argument that plaintiffs' counsel violated "the ground rules" by speaking with Carver (see Doc. #66, p. 20) and rejects the opinion of defendants' expert that plaintiffs' counsel violated Rule 4-4.2 by speaking with Carver.

This permitted conversation, however, is subject to two caveats: "no inquiry can be made into any matters that are the subject of the attorney-client privilege, and [] the requirements of Rule 4-4.3, []titled 'Dealing With Unrepresented Persons,' must be scrupulously observed." H.B.A. Management, 693 So. 2d at 543. It is the first matter which is at issue in this case.

## B. Privileged or Confidential Communications:

Defendants contend that plaintiffs' counsel violated one of the caveats to Rule 4-4.2 and violated Rule 4-4.4 by actively eliciting privileged and confidential information during their conversations with Carver. As the basis for confidentiality, defendants rely upon Carver's confidentiality agreement with IBC, her "officership" in IBC and her professional position as a Certified Public Accountant.

"The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential." Bogle v. McClure, 332 F.3d 1347, 1358 (11th Cir. 2003) (quoting United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991)). There is no dispute that an attorney-client relationship existed between Local and its successors and Arnold & Porter.[19] There is

_____

[19]Plaintiffs assert that the Colliers were joint clients of Arnold & Porter as to all matters relevant to the issues in the FDIC Case (Doc. #81, pp. 10-12, 14-15). However, at the
(continued...)

also no dispute that Carver was a corporate employee/officer whose conversations with Arnold & Porter fell within the scope of the corporation's attorney-client privilege. Southern Bell Tel. & Tel. Co. v. Deason, 632 So. 2d 1377 (Fla. 1994).

Under federal law, there exists no confidential accountant-client privilege, Couch v. United States, 409 U.S. 322, 335 (1973) or accountant work product privilege, United States v. Arthur Young & Co., 465 U.S. 805, (1984). It is undisputed, however, that Carver signed a Code of Ethics with IBC and was bound by the provisions of that Code. The IBC Code of Conduct provided that Carver would "[t]ake all reasonable measures to protect the confidentiality of non-public information about IBC or its subsidiaries and their customers obtained or created in connection with your activities and to prevent the unauthorized disclosure of such information unless required by applicable law or regulation or legal or regulatory process." (Carver Dep., Exh. 10 at p. 3.) There is no evidence that Carver had any greater obligation of confidentiality as an employee/officer of Local or as a Certified Public Accountant than would be required under the attorney-client privilege. Rule 4-4.4 precludes an attorney from making unwarranted intrusions which would cause Carver to violate her duty of confidentiality.

---

[19](...continued)
evidentiary hearing, plaintiffs expressly stated they were not relying upon that contention in support of their opposition to the Motion to Strike.

The issue becomes, therefore, whether the particular communications by Carver were confidential, either as a matter of the attorney-client privilege or her confidentiality obligations with IBC. "To determine if a particular communication is confidential and protected by the attorney-client privilege, the privilege holder must prove the communication was (1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential." <u>Bogle</u>, 332 F.3d at 1358 (emphasis in original; internal quotation omitted.) The Court finds no reason to impose a different standard as to the confidentiality obligations.

It is clear that Carver disclosed to plaintiffs' counsel three categories of tax deductions taken by Local and related information: first, the deductions for the 1997-2002 tax years of attorneys' fees paid by the Colliers in the FDIC Dispute; second, the deduction taken on the 2002 return for the principal paid to the FDIC on the FDIC Counterclaim; and third, the excess basis deduction taken in 2003 on amended tax returns. For the reasons set forth below, the Court finds no conduct that merits any of the sanctions requested by defendants.

The Court would first note that the scope of confidentiality about tax advice is not as broad as defendants suggest. In <u>In re Grand Jury Investigation (Schroeder)</u>, 842 F.2d 1223 (11th Cir. 1987), the Court discussed whether statements made to an

accountant/attorney who prepared a client's tax return were protected by the attorney-client privilege. The Court stated in pertinent part:

> The attorney-client privilege attaches only to communications made in confidence to an attorney by that attorney's client for the purposes of securing legal advice or assistance. Courts generally have held that the preparation of tax returns does not constitute legal advice within the scope of that privilege. We agree with the majority rule. Admittedly, the preparation of a tax return requires some knowledge of the law, and the manner in which a tax return is prepared can be viewed as an implicit interpretation of that law. Nevertheless, the preparation of a tax return should not be viewed as legal advice. If a professional accountant prepares a tax return, his client cannot invoke any privilege, for there is no accountant-client privilege under federal law. Couch v. United States, 409 U.S. 322, 335, 93 S. Ct. 611, 619, 34 L. Ed. 2d 548 (1973). A taxpayer should not be able to invoke a privilege simply because he hires an attorney to prepare his tax returns. Thus, any information [the client] transmitted to [the attorney/accountant] for the purpose of preparing his tax returns, including the sources of his income, is not privileged information.

In re Grand Jury, 842 F.2d at 1224-25. Additionally, disclosure of information in a tax return waives the privilege not only to the disclosed data but also as to the details underlying that information. United States v. Davis, 636 F.2d 1028, 1043 n.18 (5th Cir. 1981). See also In re Grand Jury, 842 F.2d at 1225-26.

This is not to say that no legal advice on tax matters can be privileged. "Obviously a lawyer who prepares a tax return can provide legal advice on tax matters unrelated to the preparation of that return. Such advice falls within the scope of the

attorney-client privilege. Also the lawyer might provide legal advice on non-tax matters. Such advice falls within the scope of the attorney-client privilege as well." <u>In re Grand Jury</u>, 842 F.2d at 1225.

Carver prepared the tax returns for Local. It is clear that Carver's discussions of the three "buckets" of tax deductions were about deductions actually taken on tax returns or amended tax returns. Accordingly, Carver's disclosures of discussions about these deductions were not disclosures of privileged or confidential communications.

Additionally and perhaps more significantly in the context of this case, the Court finds that under the unique facts of this case, the disclosed information about these tax deductions were neither privileged nor confidential <u>as to the Colliers</u>. The Court does not accept defendants' arguments that the deductions do not relate to the FDIC Case and therefore the Colliers were not entitled to the information. It is reasonable to interpret the various agreements, as well as the conduct of the parties pursuant to those agreements, as requiring good faith and full disclosure through the conclusion of the FDIC Case. To argue, as defendants do, that the conclusion occurred sometime before the distribution of the $5.8 million is both unreasonable and incompatible with the long history between the Colliers and Local. It is clear that neither Local nor the Colliers was interested in such a pyrrhic

victory. As defendant Yalowitz wrote in an October 31, 2006 letter to the Colliers, Arnold & Porter "made every effort to provide complete information about the Guarini claim and our (ultimately successful) efforts to prosecute it to judgment and to collect the judgment." As it relates to the agreements between the Colliers and Local, the FDIC Case was not over until the proceeds were disbursed.

Of the three tax deductions, only the excess basis deduction is even arguably too remote from the FDIC Case. This argument is fatally undermined, however, because even Arnold & Porter viewed it as being related to the FDIC Case. Arnold & Porter sent a copy of the amended tax return with this deduction both to the Department of Justice attorneys in the litigation and to the Colliers' representative. While the Colliers appear not to have appreciated the significance of the amended tax return, it cannot be successfully argued that the deduction was privileged as to the Colliers when they were sent a copy of the amended tax return. Therefore, as to the Colliers, the Court concludes that the information related to the three tax deductions, including the knowledge of Arnold & Porter, Carver's personal opinions and the Jenkens & Gilchrist opinion, was not privileged or confidential as to the Colliers.

The Court also rejects defendants' argument that plaintiffs' counsel were unethical by unilaterally deciding to speak with

Carver instead of seeking judicial intervention. There was no litigation then pending between the Colliers and Local/IBC, and there is no requirement that the Colliers file suit for a judicial determination of whether they may speak with a particular person. No case cited by defendants creates such a duty under the circumstances of this case.

Finally, the short-lived contingency fee agreement with Carver causes concern. The Court notes, however, that the substance of most of the disclosures was exposed on or before August 31, 2006, prior to the discussion of a contingency fee arrangement. Prior to filing suit, the contingency fee arrangement was terminated by the parties. Thus, the Court finds that sanctions are not warranted.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion to Strike Privileged and Confidential Material (Doc. #66) is **DENIED.**

2. Defendants shall file their answers within **TEN (10) DAYS** of the date of this Opinion and Order.

**DONE AND ORDERED** at Fort Myers, Florida, this __29th__ day of May, 2009.

_____

JOHN E. STEELE
United States District Judge

Copies: Counsel of record